2013-1582

CORRECTED NONCONFIDENTIAL

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LELO, INC. AND LELOI AB,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

STANDARD INNOVATION (US) CORP.
AND STANDARD INNOVATION CORPORATION,

Intervenors.

On appeal from the United States International Trade Commission
in Investigation No. 337-TA-823.

## NONCONFIDENTIAL BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

JAMES WORTH
Acting Assistant General Counsel
Telephone (202) 205-3065

MICHAEL HALDENSTEIN
Attorney for Appellee
Office of the General Counsel
U.S. International Trade
Commission
500 E Street, SW, Suite 707
Washington, DC 20436
Telephone (202) 205-3041

Dated: May 14, 2014

*On pages 2, 5, 15-17, 23, 25-26, 28, 32-35, 37, 39-40, and 42-43 confidential information has been redacted pursuant to the protective order issued by the International Trade Commission. This confidential business information relates to materials, suppliers, and pricing of components used to manufacture We-Vibe devices, as well as sales figures of We-Vibe products and other expenditures of Standard Innovation.*

## TABLE OF CONTENTS

**PAGE**

I. STATEMENT OF JURISDICTION .........................................................2

II. STATEMENT OF THE ISSUES ..............................................................2

III. STATEMENT OF THE CASE .................................................................2

    A. The Commission's Investigation............................................................3

    B. Complainants in the Commission Investigation ..................................5

    C. Respondents and Accused Products.......................................................6

    D. The Field of Invention ...........................................................................7

    E. The Independent Claims of the '605 Patent .........................................9

    F. Prosecution History ........................................................................... 10

    G. Claim Construction..............................................................................12

    H. Indefiniteness.......................................................................................14

    I. The Commission's Domestic Industry Findings ................................15

IV. SUMMARY OF THE ARGUMENT .......................................................17

## TABLE OF CONTENTS CONT'D

**V. ARGUMENT**.................................................................**19**

    **A. Standard of Review**..........................................................**19**

    **B. The Commission's Determination that the Economic Prong of the Domestic Industry Requirement is Satisfied is Supported by Substantial Evidence**.................................................**21**

        **1. The Domestic Industry Requirement**......................................**21**

        **2. The Commission found that Three Domestically-Produced Components are Critical for the We-Vibe and Constituted a Significant Investment in Plant and Equipment and Employment of Labor or Capital**............................................**22**

        **3. Lelo's Argument that the Commission Must Disregard Production Activity Related to Exported Articles is Meritless**.................................................**27**

        **4. The Commission Properly Relied on Evidence Indicative of Investment in the Domestic Industry**......................................**28**

            **i. Investment in Domestic Industry Need Not Be Further Allocated to Individual Categories**....................................**29**

            **ii. The Commission Reasonably Relied on the Evidence of Record**.................................................**32**

        **5. The Domestic Components Do Not Need to be Produced Specifically for the We-Vibe**.......................................**34**

        **6. The Commission Reasonably Weighed the Domestic Content of the Articles in the Context of the Marketplace and Product at Issue**.......................................**34**

## TABLE OF CONTENTS CONT'D

7.     Lelo's Arguments Concerning the Importance of the Domestic Components to the We-Vibe are Incorrect...........38

8.     The Commission Properly Considered the Importance of the We-Vibe and the Domestic Components to Standard Innovation ...............................................................41

C.   The Commission Correctly Construed the Disputed Claim Terms44

    1.     The Commission Correctly Determined that the Preamble of the Independent Claims is a Claim Limitation ......................44

    2.     The Commission Correctly Construed "Generally Tear-Drop Shaped" ...........................................................49

    3.     The Patentee did not Disclaim Bulbous Shaped Arms .........52

    4.     The Patentee did not Disclaim Hooked Shaped Arms..........54

    5.     The Commission Correctly Construed "Intercourse"..........56

D.   Indefiniteness...........................................................59

    1.     Lelo Has not Shown that the Claim Term "generally tear-drop shaped" is Indefinite .......................................60

    2.     Lelo did not Demonstrate that the Preamble "dimensioned to be worn by a female during intercourse" is Indefinite ....62

VI.   CONCLUSION ...........................................................66

# TABLE OF AUTHORITIES

## Cases

*Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003).........................20

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
  340 F.3d 1298 (Fed. Cir. 2003) .............................................................49

*Andrew Corp. v. Gabriel Elecs*. Inc., 847 F.2d 819 (Fed. Cir. 1988).....................59

*Bausch & Lomb Inc. v. Moria S.A.*, 222 F.Supp.2d 616 (E.D. Pa. 2002) ..............49

*Biosig Instruments, Inc. v. Nautilus, Inc.*715 F.3d 891 (Fed. Cir. 2013) ...............58

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801, (Fed. Cir. 2002) ..................................................... 11, 43

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ..............................................................................19

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ..............................................................................19

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ..............................................................................35

*Corning Glass Works v. U.S. Int'l Trade Comm'n*,
  799 F.2d 1559 (Fed. Cir. 1986) ............................................... 19, 21, 26

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) ............................................... 18, 19, 60

*Deere & Co. v. Bush Hog, LLC,* 703 F.3d 1349 (Fed. Cir. 2012) ..........................59

*Ecolab, Inc. v. Envirochem*, Inc., 264 F.3d 1358 (Fed. Cir. 2001).........................59

*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008)....................28

# TABLE OF AUTHORITIES CONT'D

*Ex parte Brummer,* 12 USPQ2d 1653, (Bd. Pat. App. & Inter. 1989) ...................63

*Exxon Research & Eng'g Co. v. United States,*
   265 F.3d 1371 (Fed. Cir. 2001) ..................................................... 18, 63

*Finnigan Corp. v. ITC*, 180 F.3d 1354 (Fed. Cir. 1999) ........................... 26, 32, 39

*Haemonetics Corp. v. Baxter Healthcare Corp.,*
   607 F.3d 776 (Fed. Cir. 2010) .......................................................58

*Halliburton Energy Servs., Inc. v. M-I LLC,*
   514 F.3d 1244 (Fed. Cir. 2008) .....................................................58

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.,*
   802 F.2d 1367 (Fed. Cir. 1986) ................................................ 58, 64

*Int'l v. Matsushita Elec. Corp. of America*
   775 F.2d 1107 (Fed. Cir. 1985) .....................................................51

*Invitrogen Corp.v. Biocrest Mfg., L.P.*, 424 F.3d 1374 (Fed. Cir. 2005) ...............60

*Michalic v. Cleveland Tankers, Inc.,*
   364 U.S. 325 (1960) .................................................................27

*Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed.Cir.1986) ...............27

*Motorola Mobility, LLC v. Int'l Trade Comm'n,*
   737 F.3d 1345 (Fed.Cir. 2013) ......................................................19

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ...................35

*North Am. Container, Inc. v. Plastipak Packaging, Inc.,*
   415 F.3d 1335 (Fed. Cir. 2005)......................................................49

*Nutrinova Nutrition Specialties and Food Ingredients GmbH v. U.S. Int'l*
   *Trade Comm'n Nutrinova Nutrition Specialties and Food Ingredients*
   *GmbH v. International Trade Com'n,* 224 F.3d 1356 (Fed. Cir. 2000) ..............20

## TABLE OF AUTHORITIES CONT'D

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ...................52

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,*
806 F.2d 1565 (Fed. Cir. 1986) ...........................................................64

*Poly-America LP v. GSE Lining Tech. Inc.*, 383 F.3d 1303 (Fed. Cir. 2004) .........45

*Portfolio Technologies, Inc. v. Int'l Trade Comm'n,*
281 Fed. Appx. 980 (Fed. Cir. 008) ........................................................23

*Schaper Mfg. Co. v. Int'l Trade Comm'n,*
717 F.2d 1368 (Fed. Cir. 1983) ......................................... 20, 21, 39, 40

*Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*,
731 F.2d 818 (Fed. Cir. 1984) .............................................................50

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005) .......61

*Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375 (Fed. Cir. 2005).................. 52, 53

*SRI Int'l v. Matsushita Elec. Corp. of Am.,*
775 F.2d 1107, 1118 (Fed. Cir. 1985) ...............................................51

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,*
537 F.3d 1357 (Fed. Cir. 2008) .........................................................63

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
655 F.3d 1364 (Fed. Cir. 2011) .........................................................58

*Symantec Corp. v. Computer Assoc. Int'l*, 522 F.3d 1279 (Fed. Cir. 2008)............47

*Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357 (Fed. Cir. 2011)....................18

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997) ...................48

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951)...........................................................................19

# TABLE OF AUTHORITIES CONT'D

*UNR Indus., Inc. v. United States*, 962 F.2d 1013 (Fed. Cir. 1992) ........................27

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
  200 F.3d 795 (Fed. Cir. 1999) .............................................................................48

**Statutes**

19 U.S.C. § 1337(a)(1)(B) ...................................................................................20

19 U.S.C. § 1337(a)(2)............................................................................ 20, 33, 37

19 U.S.C. § 1337(a)(3) ................................................................................ passim

35 U.S.C. § 102 .....................................................................................................2

35 U.S.C. § 103 .....................................................................................................2

35 U.S.C. § 112 ...............................................................................................2, 58

35 U.S.C. § 282 ...................................................................................................58

**Code of Federal Regulations**

19 C.F.R. § 210.43 ..............................................................................................39

19 C.F.R. § 210.43(b) .........................................................................................32

**Federal Register Notices**

77 *Fed. Reg.* 1504 (Jan. 10, 2013) .......................................................................2

**Legislative History**

H.R. Rep. No. 40, 100th Cong., 1st Sess., pt. 1 (1987) .........................................21

Pub. L. No. 100-418, 102 Stat. 1107 (1988).................................................. 21, 35

# TABLE OF AUTHORITIES CONT'D

## USITC Publications

*Certain Cold Cathode Fluorescent Lamp ("CCFL") Inverter Circuits and Products Containing Same,* Inv. No. 337-TA-666 (Sept. 22, 2009)....................22

*Certain Audible Alarm Devices*, Inv. No. 337-TA-365 (Feb. 2, 1995)..................36

*Certain Cold Cathode Fluorescent Lamp Inverter Circuits and Products Containing Same*, Inv. No. 337-TA-666 (Sept. 22, 2009)......................................30

*Certain Feathered Coats and Pelts, and Process for the Manufacture Thereof*, Inv. No. 337-TA-260, (Sept. 24, 1987) ......................................... 34, 35

*Certain GPS Chips, Associated Software and Systems, and Products Containing Same,* Inv. No. 337-TA-596 (Feb. 27, 2008)................................. 22, 29

*Certain Home Vacuum Packaging Products,* Inv. No. 337-TA-496, USITC Pub. 3681 (December 17, 2003)............. 22, 30, 31

*Certain Male Prophylactic Devices,* Inv. No. 337-TA-546 (Aug. 1, 2007).... passim

*Certain Methods of Making Carbonated Candy Products,* Inv. No. 337-TA-292 (Dec. 8,1989)............................................................ 22, 30

*Certain Portable On-Car Disc Brake Lathes,* Inv. No. 337-TA-361 (1994) ...................................................................... 22, 30

*Certain Printing and Imaging Devices*, Inv. 337-TA-690 (Feb. 17, 2011) ........................................................... 24, 38, 41

*Certain Static Random Access Memories and Integrated Circuit Devices Containing Same, Processes for Making Same, Components Thereof. and Products Containing Same,* Inv. No. 337-TA-325 (May 14, 1991) ....................36

*Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337–TA–586, USITC Pub. 4120 (Dec.2009) ..................... 23, 24, 34, 41

# STATEMENT OF RELATED CASES

There is a parallel civil action in the U.S. District Court for the Southern District of Texas between Standard Innovation and Lelo, which has been stayed pursuant to 28 U.S.C. § 1659(a).  Case No. 4:11-cv-4172, Order (January 28th, 2012).  In addition, U. S. Patent No. 7,931,605 ("the '605 patent") is the subject of an ongoing *ex parte* reexamination before the U.S. Patent and Trademark Office, Control No. 90/013,035, granted November 22, 2013.  Lelo has also filed a request for an advisory opinion before the Commission as to whether certain new products fall within the scope of the orders issued in this investigation, Inv. No. 337-TA-823 (Advisory). The Commission instituted the advisory proceeding on February 7, 2014, and the proceeding is scheduled to be completed by June 30, 2014.

CONFIDENTIAL INFORMATION DELETED

## I.     STATEMENT OF JURISDICTION

The Commission concurs with the jurisdictional statement offered by appellants.

## II.     STATEMENT OF THE ISSUES

1.  Does substantial evidence support the Commission's determination that the expenditure of over $[[          ]] on domestically-produced components of the article protected by the patent is significant?

2.  Does the claim term "generally tear-drop shaped" have a plain and ordinary meaning?

3.  Is the preamble to the independent claims of the '605 patent limiting?

4.  Did the Commission correctly conclude that the claim term "generally tear-drop shaped" and the preamble are not invalid for indefiniteness?

5.  Did the Commission correctly construe the claim term "intercourse?"

## III.     STATEMENT OF THE CASE

This appeal is from the final determination of the U.S. International Trade Commission ("the Commission") in *Certain Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, an investigation conducted under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("section 337").

2

## A.     The Commission's Investigation

The Commission instituted this investigation on January 4, 2012, based on a complaint filed by Standard Innovation (US) Corp. and Standard Innovation Corporation (collectively, "Standard Innovation").  77 *Fed. Reg.* 1504 (January 10, 2012).  The notice of institution named twenty-one respondents, but after settlement agreements between the parties, only respondents Lelo Inc. and Leloi AB (collectively, "Lelo" or "Lelo Respondents") and several distributors of the accused products remained in the investigation at the time of the Commission's final determination.

On January 8, 2013, the presiding administrative law judge ("ALJ") (Judge Pender) issued a final initial determination ("ID") finding no violation of section 337 in the investigation.  He found that the asserted claims of U.S. Patent No. 7,931,605 ("the '605 patent") were infringed by the accused products; that the asserted claims were not invalid by reason of obviousness under 35 U.S.C. § 103, indefiniteness under 35 U.S.C. § 112, or anticipation under of 35 U.S.C. § 102; and that the technical prong of the domestic industry requirement was satisfied.  However, he found that the economic prong of the domestic industry requirement was not satisfied.  Accordingly, he found no violation of section 337 with respect to the '605 patent.

On January 22, 2013, Standard Innovation and the Commission Investigative Attorney ("IA") filed petitions for review of the final ID that challenged the ALJ's finding that the domestic industry requirement is not satisfied. Respondents filed a contingent petition for review of the final ID on January 22, 2013. Each of the parties filed a response to the petition and contingent petition for review on January 30, 2013.

On March 25, 2013, the Commission determined to review the ID in its entirety and posed questions to the parties concerning the economic prong of the domestic industry requirement. The parties and the IA submitted briefs on April 8, 2013, and briefs in reply on April 15, 2013, concerning the Commission's questions and the issues of remedy, the public interest, and bonding.

On June 17, 2013, the Commission determined that there was a violation of section 337. The Commission reversed the ALJ's determination that complainant Standard Innovation had not satisfied the economic prong of the domestic industry requirement. The Commission determined to affirm the majority of the ALJ's conclusions with respect to claim construction, infringement and validity. However, it also found that the patentee disclaimed round shapes during prosecution of the '605 patent, and accordingly modified the construction of the term "generally tear-drop shaped" to indicate that a round arm (in cross section) does not satisfy the tear-drop shaped arm limitation in any of the three independent

4

CONFIDENTIAL INFORMATION DELETED

claims. Because of this revised claim construction, the Commission found that one of Lelo's accused products, the Picobong Mahana, which has round arms, does not infringe. The Commission affirmed the ALJ's finding that the Lelo Tiani and Tiani 2 products infringe. The Commission also vacated the ALJ's finding that complainant had waived its allegations concerning infringement and the technical prong of the domestic industry requirement. The Commission thus found a violation with respect to claims 1-7, 9-21, 23, 24, 33-40, 42-54, 56, 57, 66-73, 75-87, 89, and 90 of the '605 patent. Also on June 17, 2013, the Commission issued a general exclusion order and cease and desist orders.[1] The period of Presidential review ended on August 16, 2013. On August 22, 2013, Lelo filed this appeal.

### B.    Complainants in the Commission Investigation

Complainant Standard Innovation Corporation is a corporation organized under the laws of Canada and has its headquarters in Ontario, Canada. Standard Innovation Corporation has been involved in the design and manufacturing of sexual wellness products since 2004. A31. Standard Innovation (US) Corporation is the U.S. subsidiary of Standard Innovation Corporation and distributes and sells Standard Innovation Corporation's products in the United States. A31. As set forth below, complainants purchased $[[          ]] worth of components from U.S.

---

[1] On February 7, 2014, the Commission issued a corrected version of the orders to correct a clerical error. A17000-A17061.

subcontractors for the production of articles (the We-Vibe products) that practice the '605 patent. Standard Innovation's current We-Vibe product is depicted below:



**We-Vibe 3**

A1625.

## C. Respondents and Accused Products

The Lelo Respondents manufactured the accused products at issue in the Commission's final determination. A31. Lelo Inc. is a California corporation and Leloi AB is a corporation having its principal place of business in Stockholm, Sweden. Leloi AB is a majority shareholder of Lelo Inc. A31. The accused products at issue in the Commission's final determination are Lelo's Insignia

Tiani, Lelo's Insignia Tiani 2, and Lelo's Picobong Mahana.  A190.  As stated

above, the Commission found the Tiani and Tiani 2 to be infringing.



**Insignia Tiani**

A653. *See also* A1292 (Tiani 2).

### D.     The Field of Invention

The '605 patent is the only patent at issue in the investigation.  It is directed

to an "Electro-Mechanical Sexual Stimulation Device to be Worn during

Intercourse."

The field of invention relates to electro-mechanical sexual stimulation

devices for use by women either as an auto-erotic aid or during intercourse.

According to the patent's Summary of the Invention, the sexual stimulation

devices at issue are generally U-shaped and have inner and outer arms joined

together by a C-shaped connecting arm.



**Image reproduced from the '605 Patent**

The inner arm (*i.e.,* the smaller arm) of the device is sized to be inserted into

the vagina so that it contacts the wall of the vagina at or near the G-spot during

intercourse. *See* '605 patent, 2:13-20. The outer arm is sized to contact the clitoris

during intercourse. *Id.* The C-shaped member that connects the two arms is

slender and resilient, which enables it to be worn during intercourse. Further, both

the inner and outer arms may contain a vibrator to stimulate the clitoris, the G-spot,

and the vagina simultaneously.  A33-34. The patentee indicated that this device is the first that can be worn by a female during sexual intercourse because the inner arm is dimensioned to permit a male member to enter the vagina while the device is in use.  *See* '605 patent 2:2-20.

### E.  The Independent Claims of the '605 Patent

Claims 1, 33, and 66 are the asserted independent claims of the '605 patent. They read as follows (disputed terms in bold):

**1.** A sexual stimulation device **dimensioned to be worn by a female during intercourse** comprising;

a.) an elongate inner arm dimensioned for placement inside a vagina;
b.) an elongate outer arm dimensioned for placement against a clitoral area;
c.) a connecting portion connecting said inner and outer arms;

wherein, the elongate inner arm and the elongate outer arm are enlarged relative to the connecting portion and each of said arms taper down toward said connecting portion; and

wherein, at least one of the inner and outer arms are **generally tear-drop shaped**.

'605 patent, col. 10, lines 24-37.

**33.** A sexual stimulation device **dimensioned to be worn by a female during intercourse** comprising;

a.) an elongate inner arm dimensioned for placement inside a vagina;
b.) an elongate outer arm dimensioned for placement against a clitoral area;
c.) a connecting portion connecting said inner and outer arms;

wherein, the elongate inner arm and the elongate outer arm are enlarged relative to the connecting portion and each of said arms taper down toward said connecting portion;

wherein said connecting portion which has a width which is equal to or greater than its thickness to minimize obstruction to the vaginal opening; and

wherein, at least one of the inner and outer arms are **generally tear-drop shaped**.

'605 patent, col. 11, lines 44-59.

**66.** A sexual stimulation device **dimensioned to be worn by a female during intercourse** comprising;

a.) an elongate inner arm dimensioned for placement inside a vagina;
b.) an elongate outer arm dimensioned for placement against a clitoral area;
c.) a connecting portion connecting said inner and outer arms;

wherein, the elongate inner arm and the elongate outer arm are enlarged relative to the connecting portion and at least one of the arms tapers down toward said connecting portion; and

wherein, at least one of the inner and outer arms are **generally tear-drop shaped**.

'605 patent, col. 13, lines 1-14.

### F.    Prosecution History

The claims originally drafted for prosecution contained the limitation

"dimensioned for insertion into a vagina" in the body of the claims.  A2524.

Claims were later amended to add "wherein said U-shaped member is slender

enough to permit sexual intercourse when said inner arm is inserted in vagina" to

the body.  A2562.  The patent examiner rejected the original claims, *inter alia*, as

indefinite and as obvious in light of the prior art. A2863-2875.  To traverse the

rejection, the patentee canceled all original claims, and drafted new claims with

"dimensioned to be worn by a female during intercourse" in the preamble.  A2892-2894.  In his remarks, the patentee emphasized that: "As discussed during the telephonic interview, each of the arms of the device are enlarged, *i.e.* larger relative to the connection portion.  Moreover the enlarged arms taper down towards the middle portion to provide a configuration which is dimensioned to be worn by a female during intercourse."  A2893.  He explained that "[t]he combination of the enlarged arms relative to the connecting portion and the tapering down of at least one arm, and desirably both arms toward the connecting portion, clearly distinguishes the invention from the prior art and in fact permits the configuration to be dimensioned such that the female can wear it during intercourse."  A2893-94.  In another amendment, the applicant stated that "the Applicant's invention is intended to be worn by a woman **during intercourse** which differentiates Applicant's invention from any other cited prior art device."  A2847 (Amendment filed April 29, 2010) (emphasis in original).  He continued:

> Applicant's device has an inner arm, an outer arm and middle portion.  Both the inner arm and the middle portion are shaped to provide the dual function of permitting intercourse to occur while allowing the device to remain in place during intercourse.  As recited in the prior response, the middle portion has low profile which is small enough to keep the vaginal opening free for intercourse.  In use, the middle portion is nestled at the top of the vaginal opening.  The low profile is achieved by making the middle portion smaller in cross-sectional area than one or both of the inner arm or the outer arm, as previously claimed.

*Id.*

### G.    Claim Construction

*Construction of the preamble*

The ALJ explained that this Court has indicated that a preamble is limiting if any of the following four circumstances are present:  (1) the specification makes clear that the inventors were working on the specific problem described by the preamble; (2) the preamble provides necessary context for the claimed invention that is necessary to describe the invention; (3) the preamble adds a structural limitation to the body of the claim; or (4) the patentee uses the limitations in the preamble to distinguish the prior art during prosecution.  A57 (citing *Catalina Marketing International, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 807–11 (Fed. Cir. 2002)).  The ALJ concluded that all four of the circumstances were present and that the preamble should be given a limiting effect.  A56-62.  The Commission agreed with the ALJ and affirmed.  A190.

*Construction of "generally tear-drop shaped"*

Independent claims 1, 33, and 66 recite "at least one of the inner and outer arms are [sic] generally tear-drop shaped."  The ALJ found that the parties generally agreed on the definition and that the term has a plain and ordinary meaning and requires no construction. A67-68.

12

The ALJ found that language in the prosecution history falls "far short" of disclaiming bulbous or round shapes. A70. The ALJ also concluded that hook shapes were not disclaimed. A71.

The Commission affirmed the ALJ's reliance on the plain and ordinary meaning of " generally tear-drop shaped" and the ALJ's finding that the patentee did not disclaim bulbous or hook shapes during prosecution of the '605 patent. A196. The Commission disagreed with the ALJ concerning round arms. It determined that the patentee disclaimed round shapes during prosecution. A198 (citing A2852). The Commission therefore did not include arms with round cross-section in the definition of generally tear-drop shaped. A198. This resulted in the Commission finding that Lelo's Picobong Mahana does not infringe. A204.

*Construction of "intercourse"*

The Commission adopted the ALJ's finding that "intercourse" as used in the preamble means coitus, *i.e.,* penile-vaginal intercourse between a man and a woman. A63-67; A190. Reviewing the specification and claims of the '605 patent, the ALJ found that there is nothing to suggest that the claimed device should be inserted in a different manner, as Lelo had argued. He noted that the specification, claims, and prosecution history all indicate that coitus is the only type of intercourse contemplated by the patent and the claims for use with the device. A65-66.

13

## H.    Indefiniteness

*Whether "generally tear-drop shaped" is definite*

The ALJ indicated that the meaning of "generally tear-drop shaped" is clear on its face and the specification provides sufficient explanation for the meaning of generally tear-drop shaped arms.  A88 (citing '605 patent, Figs. 1-5).  In addition to these figures, there is discussion of the shape of the arms of the device in the specification.  *See* '605 Patent, 2:25, 3:12.  The Commission affirmed the ALJ. A88; A198.

*Whether the preamble is definite*

The ALJ concluded that the evidence did not show that the preamble phrase "dimensioned to be worn by a female during intercourse" is indefinite.  As to the "dimensioned" limitation, the Commission found that the invention must be properly sized to be used during intercourse.  A190 n.1 (citing the '605 Patent, 7:21-29, 58-60; 8:4-8, 10).  The patent explains that the arms range up to 1" wide and about 0.2" thick, and there are several figures along with other guidance as to the dimensioning of the parts of the device.  *Ibid.*  While Lelo contended that this language does not specify where on the female body the sexual stimulation device should be worn, the ALJ disagreed.  The ALJ found the specification provided sufficient guidance to one skilled in the art regarding the term "intercourse," so the

CONFIDENTIAL INFORMATION DELETED

preamble language was not indefinite. A89. The Commission affirmed the ALJ's

finding that the preamble language is not indefinite. A187.

## I. The Commission's Domestic Industry Findings

The Commission found that Standard Innovation's expenditures of over

$[[        ]] on three domestically-produced components of the article protected

by the '605 patent that are critical to the We-Vibe (the company's flagship

product) are significant in the context of a small start-up company developing  a

new market for couples vibrators. A221. The Commission found that the three

domestically-produced components, [[                    ]] and certain

microcontroller products, are crucial to the functionality of the We-Vibe. A220.

[[                                                  ]] and is considered its

"secret sauce" because it is so critical to the We-Vibe functionality. A220 (quoting

A14881 at Q/A39-40 ). Standard Innovation indicated that it experimented with

[[


]]. A220

(citing A14881 at Q/A39-40). *See also* A14908. The Commission also found that

[[                              ]] is another critical component for the We-Vibe.

This component is necessary because [[

CONFIDENTIAL INFORMATION DELETED

]]. Standard Innovation spent months just prior to the launch of We-Vibe trying to resolve these manufacturing issues. Standard Innovation determined that the best resolution was to [[

]] while leaving an even finish. A220 (citing A14914-915 at Q/A170). Finally, the Commission found that the microcontroller products from [[                      ]] are crucial components; they enable the We-Vibe to function as a vibrator (particularly as a vibrator with multiple vibration modes) by controlling the vibrator motor and mode selection. A221 (citing A14893).

The Commission recognized that [[  ]] percent is a relatively modest proportion of domestic content viewed in isolation, but under its precedent, there is no bright-line threshold for domestic value-added to satisfy the domestic industry requirement. A219. The Commission found that the $[[        ]] domestic investment was significant when viewed in context.

The Commission found that the contribution of the components at issue from a qualitative standpoint is significant considering the article of commerce, and the realities of the marketplace. The Commission also noted that Standard Innovation is a start-up company and the We-Vibe is Standard Innovation's flagship product and that it has created a new niche market for couples vibrators through its product

innovations.  It noted that We-Vibe products account for more than [[    ]] percent of Standard Innovation's sales. A221.  The importance of the components to the We-Vibe and the importance of the We-Vibe to Standard Innovation weighed heavily in favor of finding a domestic industry.  It found that Standard Innovation's expenditure of over $[[        ]] on components directly related to the '605 patent and critical to the We-Vibe (the company's flagship product) are significant in the context of a small start-up company developing a new market for couples vibrators.  A221.

## IV.     SUMMARY OF THE ARGUMENT

The Commission's determination that the economic prong of the domestic industry requirement is satisfied in this investigation is supported by substantial evidence.  The Commission carefully weighed Standard Innovation's purchase of over $[[        ]] in domestically-produced components that are critical to Standard Innovation's We-Vibe products.  The Commission recognized that there is a relatively modest contribution to total cost from the domestically-produced components, but the Commission found that the contribution of the critical domestic components from a qualitative standpoint is significant considering the article of commerce and the realities of the marketplace.

Many of Lelo's arguments seek to elevate one consideration, domestic content relative to foreign content, above all other considerations, but the Commission reasonably weighed the evidence and found the domestic investment to be significant under the circumstances for a start-up company because of the critical nature of the domestic components to the article of commerce. Lelo's other arguments, such as claiming that microcontrollers are not crucial to the We-Vibe because they were not used in the first model of the We-Vibe, are misplaced. Lelo did not dispute before the Commission that these components are crucial. Likewise, Lelo's arguments that the Commission did not follow the law or its own precedent in finding Standard Innovation's domestic investment significant are also incorrect. The Commission reasonably weighed all of the relevant evidence in making its determination, following its own precedent and that of this Court. Its determination is supported by substantial evidence.

Lelo's claim construction and validity arguments are equally without merit. Lelo's argument that the preamble to the independent claims of the '605 patent is not limiting misconstrues the prosecution history and overlooks the Commission's and the ALJ's other bases for finding it limiting. Lelo argues that the term "generally tear-drop shaped" should have been construed but that term was not disputed below and has a plain and ordinary meaning. While Lelo argues that the

term "intercourse" has a broader meaning, the patent and the claims only

contemplate coitus.

Lelo argues that the term "generally tear-drop shaped" is indefinite.

However, words of approximation such as "generally" do not serve to invalidate

claims. Lelo also argues that the preamble is indefinite, overlooking that the '605

patent's specification describes how the device is to be used during sexual

intercourse between a man and a woman and even provides a range of dimensions

for the device that indicate how the device is to be dimensioned.

## V. ARGUMENT

### A. Standard of Review

This Court will review the Commission's claim construction findings *de*

*novo. See Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1364 (Fed. Cir.

2011). This Court also reviews the Commission's determination on indefiniteness

*de novo. Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1376

(Fed.Cir. 2001). Because a patent is presumed to be valid, the evidentiary burden

to show facts supporting a conclusion of invalidity is one of clear and convincing

evidence. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348

(Fed.Cir. 2005).

Lelo additionally challenges the Commission's conclusions concerning the domestic industry requirement of section 337. To the extent that review of the Commission's domestic industry determination requires interpretation of section 337—the statute the Commission is charged to administer—this Court generally defers to the Commission's reasonable interpretation of the statute. *See Corning Glass Works v. U.S. Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed. Cir. 1986); *see also Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).

In reviewing the Commission's factual findings concerning the existence of a domestic industry, this Court applies the "substantial evidence" test. *Motorola Mobility, LLC v. Int'l Trade Comm'n* 737 F.3d 1345, 351 (Fed. Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted). The Court does not reweigh the evidence even if an alternative conclusion can reasonably be drawn from the evidence. *Nutrinova Nutrition Specialties and Food Ingredients GmbH v. U.S. Int'l Trade Comm'n,* 224 F.3d 1356, 1359 (Fed. Cir. 2000).

B. **The Commission's Determination that the Economic Prong of the Domestic Industry Requirement is Satisfied is Supported by Substantial Evidence**

1. **The Domestic Industry Requirement**

Section 337 declares unlawful the importation, the sale for importation, or the sale in the United States after importation of articles that infringe a valid and enforceable U.S. patent. 19 U.S.C. § 1337(a)(1)(B). Section 337 further requires the presence of a domestic industry relating to the articles protected by the patent. 19 U.S.C. § 1337(a)(2).

The statute defines a domestic industry as follows:

(3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –

> (A) significant investment in plant and equipment;
> (B) significant employment of labor or capital; or
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3).

The domestic industry requirement consists of an economic prong and a technical prong. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). The economic prong recognizes that there must be a sufficient level of employment or investment in certain activities that meets the criteria of any one of the three factors listed above. *See, e.g., Schaper Mfg. Co. v. Int'l Trade Comm'n,*

21

717 F.2d 1368, 1372 (Fed. Cir. 1983) (affirming the Commission's determination of no domestic industry). *See also Corning Glass Works,* 799 F.2d at 1570. The technical prong recognizes that the specified economic investments and activities must relate to articles that are "protected by the patent" under section 337(a)(3) when such articles are relied on by the complainant.

In 1988, Congress eliminated the requirement that the domestic industry be "efficiently and economically operated" and eliminated the requirement of injury to the domestic industry for patent-based investigations. Pub. L. No. 100-418, 102 Stat. 1107 (1988). It also codified existing Commission practice by adding the first two subparagraphs under 19 U.S.C. § 1337(a)(3). H.R. Rep. No. 40, 100th Cong., 1st Sess., pt. 1 at 157 (1987).

> **2. The Commission found that Three Domestically-Produced Components are Critical for the We-Vibe and Constituted a Significant Investment in Plant and Equipment and Employment of Labor or Capital**

The ALJ found that three components produced in the United States were critical to the We-Vibe products. However, according to the ALJ, because they were not developed for use in the We-Vibe, they should not be considered in the domestic industry analysis. The ALJ also found that Standard Innovation did not provide an accounting of subcontractors' expenditures by statutory category for the

CONFIDENTIAL INFORMATION DELETED

domestic industry analysis.  A214.  Therefore he found that the domestic industry

requirement was not satisfied.  *See* A95-102.

The Commission disagreed with the ALJ, noting that the statute requires the

existence of domestic industry with respect to the articles protected by the patent,

so the components do not have to be specifically created for the articles.  A212-13.

The Commission also found that the ALJ erred by requiring that the approximately

$[[          ]] spent on domestic components be allocated to individual categories.

A214.

The Commission explained that it has not previously required a further

allocation of subcontractor expenditures to the individual statutory categories,

citing several Commission investigations:  *Certain Home Vacuum Packaging*

*Products,* Inv. No. 337-TA-496, USITC Pub. 3681, ID (Order No. 36) at 143

(December 17, 2003) (unreviewed in relevant part by Notice, Jan. 22, 2004);

*Certain Methods of Making Carbonated Candy Products,* Inv. No. 337-TA-292,

unreviewed portion of ID at 142 (Dec. 8,1989); *Certain GPS Chips, Associated*

*Software and Systems, and Products Containing Same,* Inv. No. 337-TA-596,

Order No. 37 at 16 (Feb. 27, 2008) (unreviewed); *CCFL,* Inv. No. 337-TA-666,

Order No. 30 at 5-6 (Sept. 22, 2009) (unreviewed); *Certain Portable On-Car Disc*

*Brake Lathes,* Inv. No. 337-TA-361, ID at 17-18, 21 (unreviewed in relevant part)

(1994).

Having found that expenditures to purchase the domestic components could be used to satisfy the domestic industry requirement, the Commission then considered whether the purchases should be considered "significant" within the meaning of the statute. It noted that the term "significant" in section 337(a)(3) is not expressly defined in the statute. A218; 19 U.S.C. 1337(a)(3). The Commission explained the importance of context in the Commission's analysis and that there is no threshold test for what is considered "significant" under the statute. A218 (citing *Certain Male Prophylactic Devices,* Inv. No. 337-TA-546, Comm'n Op., at 39 (Aug. 1, 2007), *aff'd Portfolio Tech., Inc. v. Int'l Trade Comm'n,* 281 Fed. Appx. 980 (Fed. Cir. 2008). It noted that it makes its determinations based upon "an examination of the facts in each investigation, the article of commerce, and the realities of the marketplace." *Id.*

While the Commission takes into account the value-added in the United States, the Commission explained that its decisions in *Certain Stringed Musical Instruments and Components Thereof* ("*Stringed Musical Instruments*"), Inv. No. 337–TA–586, USITC Pub. 4120, Comm. Op., at 26-27 (Dec.2009); *Printing and Imaging Devices;* and *Male Prophylactics* indicate that the analysis is not limited to strictly numerical comparison of domestic and foreign activities, but rather that the assessment is made in the context of the complainant's size and the industry as a whole. "[T]he magnitude of the investment cannot be assessed without

24

CONFIDENTIAL INFORMATION DELETED

consideration of the nature and importance of the complainant's activities to the patented products in the context of the marketplace or industry in question."
*Certain Printing and Imaging Devices*, Inv. 337-TA-690, Comm. Op. at 31-32 (Feb. 17, 2011) (citing *Stringed Musical Instruments*, Inv. No. 337-TA-586, Comm. Op. at 26).

Looking at the expenditures on domestic components relative to other costs, the Commission found that domestic components accounted for [[ ]] percent of the total cost of components, and domestic components accounted for [[ ]] percent of the total cost of production for the We-Vibe. A219, A219 n.14. (citing A13895-896; A14923-25). The Commission recognized that [[ ]] percent is a relatively modest proportion of domestic content viewed in isolation, but that there is no bright-line threshold for domestic value-added to satisfy the domestic industry requirement. A219 (citing *Male Prophylactics*). Although the statute does not provide a precise definition of "significant" investment, the significance of investment in the United States need not be evaluated relative to the significance of the foreign investment in purely mathematical terms. As the Commission indicated in *Male Prophylactics,* it also gives weight to qualitative considerations in assessing significance. In that case, the Commission found that complainant's domestic activities were limited to lubrication and foiling (because the condoms at

CONFIDENTIAL INFORMATION DELETED

issue were manufactured abroad), and the domestic operations were necessary to the commercial marketability of these products.

In this case, the Commission found that the contribution of the components at issue from a qualitative standpoint is significant considering the article of commerce and the realities of the marketplace. It found that the domestically-sourced components are crucial to the functionality of the We-Vibe. A219-20. The Commission also noted that the We-Vibe is Standard Innovation's flagship product and that it has created a new niche market for couples vibrators through its product innovations. We-Vibe products account for more than [[    ]] percent of Standard Innovation's sales, and the company's sales have increased dramatically since the We-Vibe's launch. A221. For the Commission, both the importance of the components to the We-Vibe products and the importance of the We-Vibe to Standard Innovation weighed heavily in favor of finding a domestic industry. It further noted that the reality of today's marketplace is that many products are assembled overseas. In this instance, crucial components for the We-Vibe products are produced domestically. It found that Standard Innovation's expenditures of over $[[          ]] on components directly related to the '605 patent and critical to the We-Vibe (the company's flagship product) are significant in the context of a small start-up company developing a new market for couples vibrators. Thus, the Commission found that Standard Innovation (by and through

its subcontractors) had shown a significant investment in domestically produced

components.   A221.

### 3. Lelo's Argument that the Commission Must Disregard Production Activity Related to Exported Articles is Meritless

Lelo's first argument is that the Commission should have discounted

Standard Innovation's expenditures on domestic components by the fraction of

We-Vibes sold outside of the United States because the articles sold outside of the

United States are not protected articles.  Lelo Br. at 22.  Lelo assumes that because

a U.S. patent cannot be infringed overseas, the domestically-sourced components

used in the production of such articles should not be part of the domestic industry

analysis.  But this is simply wrong.  The domestically-sourced components are part

of the domestic industry because they are made in the United States.  *See Corning*

*Glass Works,* 799 F.2d at 1570 (noting objective of Section 337 is "opportunities

for employment of our industrial workers").

Furthermore, the Commission never had a chance to address Lelo's novel

interpretation of the domestic industry requirement because Lelo never presented it

below and therefore waived this argument.  *Finnigan Corp. v. ITC*, 180 F.3d 1354,

1362 (Fed. Cir. 1999).  Lelo's interpretation of the statute would also undermine

the purpose of the statute by unnecessarily penalizing domestic industries reliant

CONFIDENTIAL INFORMATION DELETED

on exporting.  It would be inconsistent with the statutory purpose to disregard

domestic production of exported articles.  *See UNR Indus., Inc. v. United States,*

962 F.2d 1013, 1022-23 (Fed. Cir. 1992).  Lelo's interpretation should therefore be

rejected.

### 4. The Commission Properly Relied on Evidence Indicative of Investment in the Domestic Industry

The Commission found that the $[[          ]] cost of the domestically-

produced components was evidence of investment in domestic industry.  Lelo

argues the Commission erred by relying on evidence "indicative" of the statutory

categories of inputs, *i.e.* plant, equipment, labor, and capital. Lelo Br. at 30-33.

Lelo's argument is misplaced.  It is of course true that the complainant still has to

satisfy the statutory criteria when a subcontractor is producing components for the

protected articles.  However, the Commission was entitled to rely on the purchase

price as substantial evidence of investment in the statutory categories of inputs to

domestic industry, *i.e.* plant, equipment, labor, and capital.[2]  It is hornbook law that

direct evidence of a fact is not necessary.  *See Michalic v. Cleveland Tankers, Inc.,*

364 U.S. 325, 330 (1960).  *See also Moleculon Research Corp. v. CBS, Inc.,* 793

---

[2] Commissioner Pinkert concurred with the Commission's conclusion regarding the economic prong of the domestic industry analysis, and suggested that the purchase of inputs in the United States should be considered the "employment of capital" within the meaning of the statute.  A215 n.9.

F.2d 1261, 1272 (Fed. Cir. 1986)), abrogated on other grounds by *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc). The investment in domestic industry indicates investment in the four categories.

Moreover, when a complainant has purchased domestically-produced components from a subcontractor for incorporation into the articles protected by the patent, it is obviously difficult for the complainant to produce direct evidence of investments in plant and equipment or employment of labor or capital by the subcontractor. To require evidence from subcontractors concerning their investment in plant and equipment and labor and capital, would effectively deny relief to a complainant as it would be difficult to obtain potentially sensitive company information from its subcontractors concerning such expenditures. The cited investigations show that Commission does not foreclose relief when the domestic industry is established through a subcontractor.

### i. Investment in Domestic Industry Need Not Be Further Allocated to Individual Categories

Lelo argues that the Commission should have required that Standard Innovation allocate component expenditures to plant and equipment, or labor and capital. Lelo Br. at 25. The Commission explained, in response to Lelo's arguments below, that its precedent does not require such allocations by the subcontractor, and it has considered the entire amount of a complainant's

purchases from U.S. subcontractors to the domestic industry analysis in past investigations. A214. The Commission thus considered the entire cost of the components while noting that other costs arguably were included in the payments to the subcontractors for the components. A215. While Lelo argues that the investigations cited by the Commission are distinguishable, as discussed herein Lelo does not identify any investigation in which the cost of components was further allocated to individual categories by a subcontractor producing components for purchase by the complainant.

The Commission specifically addressed this issue in *Certain GPS Chips, Associated Software and Systems, and Products Containing Same*, Inv. No. 337-TA-596, Order No. 37 at 16 (Feb. 27, 2008). In that investigation, Judge Luckern rejected the argument that Lelo makes here concerning the need for further breakouts by the subcontractor that produced component chips. "[W]hile respondents contend that SiRF's payment … for domestically manufactured [chips] that are used to make the SiRFstar III product that practices the Gronemeyer '216 patent is irrelevant to the domestic industry inquiry because SIRF did not identify 'evidence of [the subcontractor's] employment of labor and capital, its investments in plant and equipment ... or anything else related to [subcontractor's] operations,' respondents do not dispute that the [chips] are manufactured in the United States by [the subcontractor ]." *Id.* (citation omitted).

Accordingly, the ALJ did not require a breakout and considered the purchases as evidence of a domestic industry, and the Commission declined to review the ALJ's determination.

In other investigations, the Commission also did not require allocation of component expense. In *Certain Home Vacuum Packaging Products*, Inv. No. 337-TA-496, Order No. 36 at 143 (unreviewed ID), the Commission found that complainants paid subcontractors for engineering services and the Commission considered the entire amount of the payments. *Certain Home Vacuum Packaging Products*, Inv. No. 337-TA-496, Order No. 36 at 143 (unreviewed ID). In *Certain Cold Cathode Fluorescent Lamp ("CCFL") Inverter Circuits and Products Containing Same*, Inv. No. 337-TA-666, unreviewed ID at 5 (Sept. 22, 2009), the complainant paid a subcontractor to manufacture component wafers and the entire amount paid to the subcontractor was considered by the Commission. In *Certain Methods of Making Carbonated Candy Products,* Inv. No. 337-TA-292, unreviewed portion of ID at 142 (Dec. 8, 1989), the only relevant domestic activities were by a subcontractor, and there was no allocation of the subcontractor's expenditures relating to the statutory factors.[3]

---

[3] Other Commission precedent is in accord. In *Certain Portable On-Car Disc Brake Lathes*, Inv. No. 337-TA-361, ID (unreviewed in relevant part) (1994) at 17-18, 21, the ALJ found that "it is clear that complainant and its subcontractor MP make complainant's lathe in the United States, and that said production is

CONFIDENTIAL INFORMATION DELETED

ii.     **The Commission Reasonably Relied on the Evidence of Record**

Lelo also argues that the reliance on expenditures is too imprecise and speculates that the subcontractors make high profits on the purchases of commodity products. Lelo Br. at 26. The record, however, indicated that although not all of the components were designed for the We-Vibe, they are specialized products that are particularly well-suited for use in the We-Vibe. *See* A220 (citing A14881, A14915, 14893). Additionally, nothing in the record suggests that profit margins were particularly high for the components used in the We-Vibe. The Commission did acknowledge that the purchase price arguably includes other costs incurred by the subcontractors. A220

Lelo also appears to challenge the microcontroller expenditures, claiming that evidence was lacking concerning the precise fraction of production properly

---

sufficient to meet the domestic industry requirement of section 337. *Id.* at 17 (citation omitted).

In *Certain Male Prophylactic Devices,* Inv. No. 337-TA-546, Comm. Op. at 39 (2007) (citing *Certain Home Vacuum Packaging Products*, Inv. No. 337-TA-496, USITC Pub. 3681 (May 2004), Order No. 36 at 143), the Commission explained that the complainant PTI, through GPC (a shareholder of PTI), lubricated, tested and packaged in foil the condoms at GPC's facility in Boston. The unfinished condoms came from China. The Commission found that "[i]n the 14-month period ending February 2005, GPC charged PTI for approximately [[     ]] hours of work on PTI matters." Comm. Op. at 41. There was no allocation to categories by cost.

attributable to domestic production.[4]  Lelo Br. at 26.  The Commission's ALJ

credited [[    ]] percent of the manufacturing costs of these parts to account for the

portion of the manufacturing that occurs in the United States.  A96.  He thus found

$[[          ]] of the microcontroller parts expense eligible to be attributed to

Standard Innovation's domestic industry.  A96.  The Commission did not disturb

this finding.  A208; A2236-2237 (Tr. 226:14-24, 227:1-5).

It is too late for Lelo to challenge this factual finding, which is supported by

substantial evidence presented to the ALJ.  It had the opportunity to do so before

the ALJ and the Commission, which called for additional briefing on domestic

industry issues.  A party seeking review by this Court of a determination by the

Commission must have "specifically asserted" the error made by the ALJ in its

petition for review to the Commission.  Lelo did not challenge this finding in its

petition.  Accordingly, Lelo's challenge to this factual finding is waived.

Commission Rule 210.43(b) (19 C.F.R. § 210.43(b));  *Finnigan Corp,*. 180 F.3d at

1362 ("A party seeking review in this court of a determination by the Commission

must 'specifically assert' the error made by the ALJ in its petition for review to the

Commission.").

---

[4] Lelo, however, adopts the [[    ]] percent figure as a fact in its statement of
the case.  Lelo Br. at 12 (stating that manufacture of the wafer accounts for [[    ]]
percent of the cost of production).

CONFIDENTIAL INFORMATION DELETED

## 5.     The Domestic Components Do Not Need to be Produced Specifically for the We-Vibe

The Commission also explained that, contrary to Lelo's argument, it would not require that all the domestic components be produced specifically for the We-Vibe.  A212-13.  The [[                    ]] were customized specifically for the We-Vibe while the other domestic components were not.  A98-99.  There is no requirement that the components have to be developed or produced specifically for the domestic industry products.  The statute indicates that the industry has to exist "relating to the articles protected by the patent" and "with respect to the articles protected by the patent." 19 U.S.C. § 1337(a)(2), (3).  A component of an article does not have to be patented to be part of "the article protected by the patent."  *Id.*  As the Commission explained, requiring that the components be developed for the patented article would go well beyond the statutory language which only requires investment "related" to the articles protected by the patent.  Lelo has not provided any authority to the contrary.

## 6.     The Commission Reasonably Weighed the Domestic Content of the Articles in the Context of the Marketplace and Product at Issue

The relevant domestic industry under the statute is the domestic industry in the article protected by the patent.  Thus, the investment is assessed in relation to

CONFIDENTIAL INFORMATION DELETED

the saleable article. The Commission properly did not consider whether the investment is significant in relation to the total amount of a subcontractor's business, but rather it considered whether investment is significant in relation to the saleable article. Further, the "article" protected by the patent includes both patented and non-patented components.

Lelo argues that the Commission erred by giving too little weight to the relatively modest portion of domestic components in comparison to total revenues earned and the total cost of production. Lelo Br. at 33-35. However, the Commission appropriately considered these factors, but as it explained, it weighed the domestic content in the context of the articles, marketplace, and complainant. A219 (citing *Stringed Musical Instruments, Printing and Imaging Devices,* and *Male Prophylactics*). The domestic components were crucial to the We-Vibe and related to the claims, with the exception of the [[         ]], which was a small part of the domestic component purchases. A220-21. *See* A96 ("With respect to these three components, the record shows that each directly relate to a claim in the '605 patent."). Lelo's argument that the modest domestic content of the We-Vibe precludes a finding of a domestic industry is baseless given that the Commission does not engage in a strict numerical analysis.

Lelo asserts that while the Commission was entitled to take into account qualitative considerations, its decision is at odds with decisions in *Male*

*Prophylactics,* where the Commission found a domestic industry, and *Certain*

*Feathered Coats and Pelts, and Process for the Manufacture Thereof*, Inv. No.

337-TA-260, unreviewed ID at 20-21 (Sept. 24, 1987), in which the Commission

did not find a domestic industry as to one subset of articles relied upon by

complainants because of insufficient value-added.[5] Lelo Br. at 33-35. The

Commission in this case, however, carefully considered the value-added by

domestic manufacture and weighed this factor along with other qualitative

considerations.

The Commission is entitled to decide how much weight to accord different

pieces of evidence, and it is black-letter law that, under the substantial evidence

standard, the Court may affirm the Commission even where two differing

conclusions may be drawn from the evidence, where there is reasonable evidence

to support the agency's conclusion. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607,

620 (1966) "Under the substantial evidence standard, when adequate evidence

exists on both sides of an issue, assigning evidentiary weight falls exclusively

---

[5] We note that *Certain Feathered Coats and Pelts* was decided before the 1988 Amendments to section 337. In 1988, Congress eliminated the requirement that the domestic industry be "efficiently and economically operated" and eliminated the requirement of injury to domestic industry for patent-based investigations. Pub. L. No. 100-418, 102 Stat. 1107 (1988). Further, the Commission's analysis of domestic value-added now incorporates qualitative aspects in addition to a quantitative analysis.

CONFIDENTIAL INFORMATION DELETED

within the authority of the Commission." *Nippon Steel Corp. v. United States*, 458

F.3d 1345, 1358 (Fed. Cir. 2006).

In addition the Commission has indicated that its determination on the

economic prong "is not made according to any rigid formula - there is no

mathematical threshold test." *Male Prophylactics* at 39. Indeed, the

Commission's longstanding position is that there is no minimum size for a

domestic industry. *See Certain Audible Alarm Devices*, Inv. No. 337-TA-365, ID

at 50 (Feb. 2, 1995), non-reviewed by Notice of Mar. 21, 1995 ("there is no

requirement under Section 337 that an industry be a certain size"). *See also*

*Certain Static Random Access Memories and Integrated Circuit Devices*

*Containing Same, Processes for Making Same, Components Thereof. and Products*

*Containing Same,* Inv. No. 337-TA-325, Order No.9 at 4 (May 14, 1991) ("[S]mall

businesses in this country can become larger ones, and there is a public interest in

protecting them against unfair theft of their property rights."). The Commission's

holding that complainants' $[[          ]] investment in components was significant

given the size of the start-up company and that the components are crucial to the

articles was fully supported by the evidence of record in this investigation. *See* 19

U.S.C. §1337(a)(3).

### 7. Lelo's Arguments Concerning the Importance of the Domestic Components to the We-Vibe are Incorrect

As discussed, the Commission found that the domestically produced components are crucial for the We-Vibe and relate to the asserted claims of the '605 patent, and moreover, that the We-Vibe is important to Standard Innovation. A219-21. These findings supported the Commission's finding that the production of these components in the United States satisfies the economic prong of the domestic industry requirement. A219-20. Lelo argues that the importance of the components, both to the product and to the domestic industry, should not have been considered by the Commission because they are inconsistent with the statute and Commission precedent. Lelo Br. at 35-38.

Lelo is mistaken; the Commission's analysis is consistent with its approach in earlier investigations and precedent from this Court decision. In *Male Prophylactics,* for instance, the Commission indicated that its decisions are guided by "an examination of the facts in each investigation, the article of commerce, and the realities of the marketplace." *Male Prophylactics, Comm. Op.* at 39. The Commission found that complainant's domestic activities were limited to lubrication and foiling of condoms that had been manufactured abroad. However, because the domestic operations were necessary to the commercial marketability of the condoms, the Commission found there was a domestic industry. *Id.* at 42-43.

CONFIDENTIAL INFORMATION DELETED

In *Certain Printing and Imaging Devices*, the Commission explained that, through sections 337(a)(2) and 337(a)(3)(A) and (B), Congress provided that a complainant's investment in plant and equipment or employment of labor or capital must be shown to be "significant" in relation to the articles protected by the intellectual property right concerned. *Certain Printing and Imaging Devices*, Comm. Op. at 26.

The Commission followed this established approach, finding that the fact that the domestically-produced components are crucial to the functionality of the We-Vibe weighed in favor of finding a domestic industry. *See* A220 ("The record indicates that the three domestically-sourced components ([[

]]) are crucial to the functionality of the We-Vibe.").[6]  [[                                                    ]] and is considered its "secret sauce" because it is so critical to the We-Vibe functionality. A220 (quoting A14881).  After Standard Innovation experimented with [[

]].  A14881 at Q/A 39-40.

------

[6] Lelo appears to argue that [[        ]] is more important than the domestically-produced components because it is the [[                        ]] used in the We-Vibe.  Lelo Br. at 36.  The evidence, however, indicated that the We-Vibe could not be made without incorporating the specialty domestic components [[                    ]].  A2236 (Tr. at 225:2-226:10-11).

CONFIDENTIAL INFORMATION DELETED

The Commission also found that the "microcontroller products from

[[                              ]] are also crucial components; they enable the We-Vibe

to function as a vibrator (particularly as a vibrator with multiple vibration modes)

by controlling the vibrator motor and mode selection." A220-21 (citing A14893).

Lelo's contention that the Commission erred in finding that the

domestically-produced microcontroller parts were crucial to the We-Vibe because

they were not incorporated in the first version of the product is unavailing. Lelo

Br. at 36. *See also* A207-08. (noting use in We-Vibe 2 and We-Vibe 3). First,

Lelo did not petition for review of the ALJ's finding, *see* A97, that the

microcontroller is crucial, and therefore the argument is waived. 19 C.F.R. §

210.43; *Finnigan Corp.,* 180 F.3d at 1362. Second, the microcontrollers relate to

dependent claim 18 of the '605 patent. The microcontrollers enable different

vibration modes on the We-Vibe 2 and We-Vibe 3. A97. Standard Innovation

should not be penalized for further improvements to its device through

incorporation of further patented features. Third, although the original We-Vibe

had a manual switch, Lelo does not dispute that some component is necessary to

perform the switching function.

The Commission's approach in this investigation is consistent with this

Court's teaching in *Schaper Mfg. Co.v. U.S. Int'l. Trade Comm'n*, 717 F.2d 1368

(Fed. Cir. 1983). In *Schaper*, the Court agreed with the Commission that certain

accessories for toy vehicles were appropriately not considered for domestic

industry purposes because they were not integral to the articles protected by the

patent. The Court explained that "[t]he accessories are not a necessary part of the

vehicles, nor are they integral to them." *Id.* at 1371. Thus, the court indicated that

the domestic component's importance to the protected article is appropriately

considered by the Commission. This is what the Commission did in this

investigation, finding the domestically-produced components crucial to the We-

Vibe.

Lelo maintains that the Commission has "significantly lowered the bar" to

finding a domestic industry because the Commission has not utilized the

commercial marketability standard of *Male Prophylactics*. Lelo Br. at 37. On the

contrary, the Commission has followed its precedent in *Male Prophylactics*. The

Commission has weighed the evidence and looked at the importance of the

domestic activity to the articles.

> **8.     The Commission Properly Considered the Importance of
> the We-Vibe and the Domestic Components to Standard
> Innovation**

Lelo next argues that the Commission should not have taken into account the

importance of the We-Vibe to Standard Innovation and that such a comparison

lacks legal support. Lelo Br. at 37-38. Lelo is correct that the Commission

considered the importance of the We-Vibe to Standard Innovation, noting that it is

its flagship product, accounting for more than [[    ]] percent of its sales.  A221

(citing A14952-53, A14955).

However, contrary to Lelo's argument, the Commission's practice is to take

into account the nature of complainant's domestic activities in the context of its

business and the marketplace.  The Commission explained that its decisions in

*Stringed Musical Instruments, Printing and Imaging Devices, and Male*

*Prophylactics* indicate that the assessment is made in the context of the

complainant's size and the industry as a whole.  A218.  For instance, in *Stringed*

*Musical Instruments*, the Commission clearly followed this approach.  *Stringed*

*Musical Instruments* at 26 (taking into account that complainant is an individual

and that the market for guitar parts is relatively small).  In *Male Prophylactics*, the

Commission stated that complainant "PTI is only a small player in this market, but

its size relative to the dominant firms does not operate to preclude requested relief

under section 337 as a domestic industry."  *Male Prophylactics* at 46.  In *Printing*

*and Imaging Devices,* the Commission denied relief because the "complainant

submitted no evidence to show how its activities were important to the articles

protected by the asserted patents in the context of the company's operations, the

marketplace, or the industry in question, or whether complainant's undertakings

had a direct bearing on the practice of the patent."  *Printing and Imaging Devices*

CONFIDENTIAL INFORMATION DELETED

at 46.  *See also Id.* at 27 (noting that size of complainant is considered).  The fact that the Commission also considers the value-added by domestic activities to the protected articles (as Lelo emphasizes) does not show that the Commission does not consider other factors.

In sum, the Commission considered all of the factors it typically considers when analyzing whether complainant has demonstrated satisfaction of the economic prong of the domestic industry requirement.  The Commission then provided a reasonable explanation based upon substantial evidence in the record as to why the complainant had demonstrated the existence of a domestic industry.  It found that Standard Innovation's  expenditures of over $[[          ]] on components directly related to the '605 patent and critical to the We-Vibe (the company's flagship product) are significant in the context of a small start-up company developing a new market for couples vibrators.  A221.  While Lelo argues that the Commission must give decisive weight to the contribution of domestic components relative to foreign components, the Commission reasonably considered the value added by domestic activity in both qualitative and quantitative terms to find the domestic investment significant under 19 U.S.C. § 1337(a)(3).

## C. The Commission Correctly Construed the Disputed Claim Terms

### 1. The Commission Correctly Determined that the Preamble of the Independent Claims is a Claim Limitation

The Commission adopted the ALJ's finding that the preamble to independent claims 1, 33, and 66 is a claim limitation. A190, A190 n.1. The ALJ gave a detailed explanation why the four circumstances where a preamble is limiting, discussed in *Catalina Mktg,* 289 F.3d 801 at 807-11, are present with respect to the '605 patent, and accordingly, the preamble is limiting on the claims. A56-62. As the ALJ explained, any of the four circumstances would be sufficient for the preamble to be limiting. A57. The ALJ found all four are present with respect to the preamble at issue. A57.

First, Lelo does not dispute two of the Commission's four alternative grounds for finding the preamble limiting: (1) the specification makes clear that the inventors were working on the specific problem described by the preamble; and (2) the preamble provides necessary context for the claimed invention that is necessary to describe the invention. *See* A57-58. The Court could affirm the Commission on these grounds as Lelo does not challenge them on appeal.

As to the third circumstance, Lelo disputes that the applicant for the '605 patent used the limitation in the preamble to distinguish prior art (ground 4). Lelo Br. at 38-45. Lelo's argument appears to be that the preamble language was not

specifically used to overcome prior art, but Lelo's argument relies on an unduly restrictive reading of selected excerpts from the prosecution history.  Lelo Br. 40-43.

The ALJ reviewed the '605 patent's prosecution history and a series of amendments indicating that prior art was distinguished on the basis that the invention of the '605 patent was dimensioned so that it could be used during sexual intercourse.  The applicant repeatedly emphasized that this was the distinguishing feature of his invention.  *See* A60-62.

For example, the applicant stated that "the Applicant's invention is intended to be worn by a woman **during intercourse** which differentiates Applicant's invention from any other cited prior art device."  A2847 (Amendment filed April 29, 2010) (emphasis in original).  The applicant later explained that "[t]he combination of the enlarged arms relative to the connecting portion and the tapering down of at least one arm, and desirably both arms <u>toward</u> the connecting portion, clearly distinguishes the invention from the prior art and in fact permits the configuration to be dimensioned such that the female can wear it during intercourse."  A2893-94 (Amendment of Oct. 12, 2010) (emphasis original).  The ALJ also reviewed several other amendments in which the applicant relied on the dimensioning of the device to overcome prior art or otherwise gain allowance of the claims.  *See* A60-62 (quoting Preliminary Amendment of July 11, 2007,

Preliminary Amendment of March 18, 2009, Preliminary Amendment of January 7, 2009, and Amendment of April 29, 2010).

Thus, the phrase "dimensioned for use during intercourse" expresses more than just an intended use as Lelo contends. It describes the structure and defining feature of the invention that was repeatedly emphasized during prosecution. Lelo also overlooks that this key feature contained in the preamble was used to overcome the prior art. Thus, the Commission correctly found the preamble language limiting on the claims.

The patentee also emphasized this distinction in the specification and it is consistent with the prosecution history. The patentee broadly described his invention, detailing its use during intercourse in the summary of the invention, and elsewhere in the '605 patent. The specification indicates that an advantage of his invention is that it can be used during sexual intercourse. '605 Patent 1:23, 2:2-4, 2:13-19, 10:18-21. Although the language of the claims indicate how the device is to be positioned when used during intercourse, the dimensioning of the device for use during intercourse is not apparent from the body of the claims alone and the preamble provides necessary context for the claim language. *See Poly-America LP v. GSE Lining Tech. Inc.*, 383 F.3d 1303, 1310-11 (Fed. Cir. 2004) (finding preamble language limiting as it did not state a purpose or an intended use of the invention, but rather a fundamental characteristic of the claimed invention).

Similarly here, the dimensioning of the device for use during intercourse is a fundamental characteristic of the device and not just a potential use.

In addition, the Commission found that the preamble adds structure, and is limiting on this basis as well. A190 n.1; A59. The device must be the proper size if it is to be used during intercourse. *See* '605 Patent, 7:21-29, 7:58-60; 8:4-8, 10. Lelo disagrees, arguing that the preamble adds no structure because the body of each claim describes an inner arm, outer arm, and middle portion. Lelo Br. at 44.

However, Lelo is mistaken. Terminology in the preamble that limits the structure of the claimed invention must be treated as a claim limitation. In this case, the language of the preamble limits the structure of the claimed invention because it provides a size restriction as explained in the specification, *i.e.,* the arms range up to 1" wide and about 0.2" thick. '605 Patent, 7:21-29, 7:58-60, 8:4-8,10:4-6. The preamble requires that the arms described in the body of each claim must be dimensioned to be worn by a woman during intercourse.

Lelo asserts that finding the preamble limiting would reintroduce limitations removed during prosecution from the claims. Lelo Br. at 42, 44. However, the cancelled claims contained limitations that are different from those of the preamble. The language that was removed was "said inner arm gradually increases in cross-sectional area in direction away from said middle portion to retain said inner arm in position on said anterior wall of said vagina during intercourse."

A2835.  The preamble language inserted was "dimensioned to be worn by a female during intercourse."  A2896.  Thus, the preamble language is different in context and structure and does not reintroduce a limitation removed during prosecution.

Lelo also relies upon an earlier version of the preamble in arguing that the preamble to the issued claims is not limiting.  Lelo Br. at 41.  An amendment to prosecution claim 67 on July 11, 2007, added the following language: "said U-shaped connecting portion being slender enough to permit sexual intercourse when said inner arm is inserted in said vagina." A2727.  Lelo argues that the added language was duplicative of the preamble to that earlier version of the claim: "a sexual stimulation device to be worn by woman during sexual intercourse."  That earlier preamble language was more general than the current language, which describes a specific structure; the current preamble is therefore not duplicative of the limitation in the body of the claim.  Regardless, Lelo's arguments concerning the earlier preamble are not pertinent to the preamble in the claims as issued.  Lelo has simply not shown that the limitations in the preamble to the issued claims are duplicative.  *See* Lelo Br. at 41 (quoting *Symantec Corp. v. Computer Assoc. Int'l*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008).  Moreover, Lelo's argument that the patentee did not intend for the preamble to be limiting based on this early amendment overlooks that later amendments to the claims relied on the preamble as issued to overcome prior art.

In sum, the Commission correctly concluded that the preamble is a claim limitation for the three independent claims of the '605 patent.

## 2. The Commission Correctly Construed "Generally Tear-Drop Shaped"

Claims 1, 33, and 66 recite "at least one of the inner and outer arms are [sic] generally tear-drop shaped." According to the ALJ, the parties generally agreed on the definition of tear-drop shaped and the term has a plain and ordinary meaning and requires no construction. A67-68. The Commission agreed with the ALJ. A196. It found that the ALJ appropriately relied on the ordinary definition because the term is within common knowledge and sufficiently clear on its face so that no further explanation for the meaning of the term was warranted. The Commission added that Lelo's expert's definition ("looking like a tear drop, which is a 3-dimensional figure") is consistent with the ALJ's view that no further explanation was needed. A196.

Lelo argues on appeal that construction of the term "generally tear-drop shaped" was needed. However, the ALJ properly construed the claim term to the extent it was in controversy. A court need construe "only those terms ... that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). *See also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Lelo

also notes that a district court has construed the term "tear drop" as "having a globular form at the bottom, tapering to a narrower portion at the top."  *Bausch & Lomb Inc. v. Moria S.A.*, 222 F.Supp.2d 616, 653 (E.D. Pa. 2002).   Lelo relies on this case to argue that the breadth of the Commission's definition of the term "generally tear-drop shaped" is insufficiently precise because it is not clear how broad the term is.  Lelo. Br. at 50.  Lelo maintains that the term "tear-drop shaped" may not need to be construed, but *generally* tear-drop shaped is not within the common knowledge.  Lelo Br. at 49.

Lelo's argument concerning "generally" is misplaced.  In *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003),  the Court "note[d] that words of approximation, such as 'generally' and 'substantially,' are descriptive terms "commonly used in patent claims to avoid a strict  numerical boundary to the specified parameter."  Accordingly, "terms of approximation such as 'generally' need not be construed with mathematical precision." *North Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005).   For instance, in *Anchor Wall Systems*, the Court found that "substantially planar" did not need to be construed and was not indefinite.  *Id.* at 1359-60.  Likewise, in this case, "generally tear-drop shaped" did not need be construed because there was no controversy concerning its meaning and it was plain on its face.  It was therefore proper for the Commission to refer to the plain

and ordinary meaning of the term "generally tear-drop shaped" and not indicate

precisely how tear-drop shaped the accused device's arm must be to satisfy the

limitation.[7]

Before the Commission, Lelo never argued that its accused devices do not

satisfy the claim limitation under the ordinary meaning of the term. Rather, Lelo

contended that certain shapes (bulbous, round and hook) were disclaimed by the

patentee and not within the meaning of the claim term. A73-74. The Commission

found that there was prosecution history disclaimer of round shapes but not

prosecution history disclaimer of bulbous or hook shapes. Lelo's noninfringement

contentions for the Tiani devices were premised solely on its alternative claim

construction arguments based on prosecution history disclaimer of bulbous and

hook shapes. As discussed below, the ALJ and the Commission properly rejected

those arguments.

Lelo also argues that an accused device, the Tiani 2, does not look like a

tear-drop from every angle, so it does not meet Lelo's proposed claim construction.

Lelo Br. at 49-50. Lelo essentially disputes that its device meets the limitation

---

[7] Lelo argues under *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984), that the specification must provide some guidance for the words of approximation. In the present case, the specification includes figures showing tear-drop shaped arms as well as detailed descriptions of the arms, so there is guidance in the specification with respect to how tear-drop shaped the arm must be to meet the claim limitation.

arguing for a claim construction requiring that an arm of the accused device appear generally tear-drop shaped from every angle. Lelo Br. at 50.

These arguments are meritless and without support in the record. There is no uncertainty concerning how the accused arm should be viewed when looking for the tear-drop shape. The figures in the '605 patent show that the device's arm appears tear-drop shaped when generally vertically oriented. '605 Patent, Figs. 1-10. Lelo has cherry-picked an alternative two-dimensional view of its device that does not show a tear-drop shape. There is no basis for Lelo's new construction requiring a three-dimensional object appear tear-drop shaped from all angles.

Furthermore, Lelo's new claim construction arguments based on different views of the accused device are improper. Lelo Br. at 49-50. "A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (emphasis in original).

### 3. The Patentee did not Disclaim Bulbous Shaped Arms

The Commission affirmed the ALJ's finding that the patentee did not disclaim "bulbous" shaped arms during prosecution of the '605 patent. The Commission agreed that the patentee did not criticize bulbous shapes in general.

Rather the prosecution history shows that the patentee distinguished the Sekulich

reference on a different basis.

> The applicant stated:
>
> [The anterior shaft of Sekulich] is phallus shaped. This means that
> the shaft is generally round until almost the very end which is
> provided with a bulbous head. A lip projects between the bulbous
> head and the round shaft. This phallus shape is completely
> unsuitable for accommodating a man's member and is opposite of
> the Applicant's claimed shape.

A2851-52. The patentee thus distinguished Sekulich based on the phallus shape

and further distinguished Sekulich based on the lip projection. The applicant

explained that the lip made the arm unsuitable. "Furthermore, the projecting lip

would act as an irritant on the sensitive male member." A2852. Thus, there was no

disclaimer based on the bulbous shape. *Omega Eng'g, Inc. v. Raytek Corp.*, 334

F.3d 1314, 1323-24 (Fed. Cir. 2003). *See also Sorensen v. Int'l Trade Comm'n*,

427 F.3d 1375, 1378 (Fed. Cir. 2005). The Commission also noted that the '605

patent's first preferred embodiment describes the teardrop shaped pad of the inner

arm as "bulbous," suggesting that a bulbous shape was not disclaimed during

prosecution. '605 Patent, 3:12 ("an inner arm 1 that terminates in a bulbous

teardrop-shaped pad").

Lelo relies on disclaimer arguments similar to those presented to the

Commission. Lelo Br. 51-52. As the Commission found, the statements by the

applicant are not clear disavowals of bulbous shaped arms. Lelo additionally

contends without record support that Standard Innovation admitted that a prior art device (Kain) has a bulbous head, but Lelo does not identify a statement by the applicant in the prosecution history that disavows bulbous arms. Lelo cites the examiner's interview summary which does not even refer to bulbous shapes or Kain. A2931. Prosecution history disclaimer must be based on statements made by the applicant in the course of prosecuting the patent application (*i.e.,* the "prosecution history"). *Sorensen*, 427 F.3d at 1378.

The Commission therefore correctly concluded that bulbous shaped arms were not disclaimed by the patent applicant during prosecution of the '605 patent.

### 4. The Patentee did not Disclaim Hooked Shaped Arms

With respect to the alleged disclaimer of hook-shape arms, the ALJ found that the patentee had explained during prosecution that the Marshall device had a shaft and a hook that would block the vaginal passage and prevent the device's use during intercourse. A70. The ALJ found no disclaimer because the patentee distinguished the Marshall device on the basis of the shaft which blocks the vaginal passage. A70-71.

The Commission agreed with the ALJ, finding that the cited portions of the specification and prosecution history (A2793-94 and '605 Patent, 1:41-60) do not indicate that the patentee disclaimed coverage of hook shapes as argued by Lelo.

Rather, the Commission found that the patentee indicated that the Marshall device was unsuitable for use during intercourse because its shaft portion blocked the vaginal passage and it narrowed from the proximal to the distal portion of the arm, the opposite of the invention described in the '605 patent.  A2793-94.

The Commission explained that hook shapes had not been disclaimed by the applicant.  It was not hook shapes per se that presented the problem.  It was that the device's shaft portion blocked the entrance to the vagina.[8]  Thus, the hook shape was not the feature criticized by the applicant.  Indeed, the figures in the '605 patent show embodiments with arms that have some curvature.  '605 Patent, Figs.1-8.  The Commission therefore correctly concluded that hook shaped arms were not disclaimed by the patent applicant during prosecution of the '605 patent.

---

[8] The ALJ noted that when asked if a hook shaped device such as the Rock Chick, *i.e.* the commercial embodiment as described in the Marshall patent, could be used during intercourse, Dr. Herbenick testified that "[i]t is not the hook that's the problem.  It's the hook in the context of this device as a whole with a large connecting portion that obstructs the vaginal opening with a rigidity that would function to push away ...."  A70-71 (quoting A2283 (Tr. 412:20-413:6)).

## 5.     The Commission Correctly Construed "Intercourse"[9]

The Commission adopted the ALJ's finding that "intercourse" as used in the preamble means coitus, *i.e.,* penile-vaginal intercourse between a man and a woman. A63-67; A190.  Reviewing the specification and claims of the '605 patent, the ALJ indicated that there is nothing to suggest that the claimed device should be inserted in a different manner, as Lelo argued.  He noted that the specification, claims and prosecution history all indicate that coitus is the only type of intercourse contemplated for use with the device.  A65-66.

The claims, when read in light of the specification, show that the term "intercourse" as used in the preamble means coitus.  As the ALJ explained, the specification refers to men and women when discussing how to wear the device and it is clear the device is to be worn during penile-vaginal intercourse.  *See* A64. (quoting '605 Patent, 8:50-53, 10:3-6, 10:17-21).  *See also* '605 Patent, 1:20-23, 2:2-4, 3:27-31, 5:11-20, 9:65-10:6, 10:17-21.

---

[9] Lelo's appeal seeks to broaden the coverage of the asserted claims of the '605 patent, challenging the Commission's determination that the term "intercourse" encompasses only coitus.  A decision favorable to Lelo on this issue would broaden the claims and would not lead to a different result in this appeal as Lelo does not press its anticipation or obviousness contentions on appeal.  Those arguments are now waived.

The prosecution history is also consistent with "intercourse" meaning penile-vaginal intercourse.  *See* ID 40-41 (quoting Amendment of January 7, 2012 and April 29, 2010).  Expert testimony before the ALJ also confirmed that the ordinary meaning of intercourse is coitus, unless it is further modified.   *See* A65-66 (quoting A2259 (Tr. 315-317).

Lelo argues that the term intercourse should encompass a broader range of forms of intercourse.  Lelo Br. at 48. However, Lelo does not identify anything in the specification or claims that intercourse, as contemplated by the '605 patent, means anything other than penile-vaginal intercourse.

Lelo relies on testimony, claiming that Standard Innovation's expert, Dr. Herbenick, agreed that the term "intercourse" is broader than "coitus."  To the contrary, what the expert indicated was that intercourse without further modification means coitus. "What I kept finding is that the term intercourse when used alone without a modifier and spanning, you know, seven or eight decades has an ordinary meaning throughout time of penile/vaginal intercourse."  A2259 (Tr. at 316: 21:25).  *See also* A65-66 (quoting A2259 Tr. 315:10:317:5).

Lelo also contends that the applicant removed the limitations "sexual intercourse" and "inserting the inner arm in a vagina" during prosecution and "[n]one of the claims of the'605 patent, including the preamble, recite 'sexual intercourse' or 'when said inner arm is inserted in a vagina.'"  Lelo Br. at 46.  It

argues that the term "intercourse" should not be defined so as to reintroduce those claim limitations.

Lelo is simply mistaken, however; all three independent claims clearly state that the inner arm is "for placement inside a vagina." '605 Patent 10:27, 11:46:47, 13:3:4. The three independent claims also refer to intercourse in the preamble, so Lelo is wrong about this as well. Lelo is wrong to suggest that the Commission's definition is reintroducing removed limitations.

Finally, Lelo argues that the Commission has mistakenly limited the term "intercourse" to one preferred embodiment because the invention can be used with a penis or other similarly shaped objects or for Kegel exercises. Lelo Br. at 47. The problem with Lelo's argument is that not all uses are indicated by the patentee to be "intercourse." Indeed, the Field of Invention indicates that "the present invention provides an electro-mechanical device for sexual stimulation intended for use by women either as an auto-erotic aid **or** during intercourse." '605 Patent 1:19-23 (emphasis added). Thus that Lelo identifies alternative uses for the device does not mean that they are encompassed within the term "intercourse." In sum, the Commission correctly construed "intercourse" and Lelo has not shown otherwise.

## D.    Indefiniteness

In order for a claim to be invalid for indefiniteness under 35 U.S.C. § 112, it must not provide sufficient clarity delineating the bounds of the claim to one skilled in the art. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011) (quotations omitted). Thus it is not amenable to construction or is insolubly ambiguous. *Id.* However, "[a]bsolute clarity is not required to find a claim term definite," and the Federal Circuit "has held that a claim term may be definite even when discerning the meaning is a formidable task and the conclusion may be one over which reasonable persons will disagree." *Id; Biosig Instruments, Inc. v. Nautilus, Inc.* 715 F.3d 891, 899 (Fed. Cir. 2013). (quotations and modifications omitted).

Furthermore, a patent is presumed valid. 35 U.S.C. § 282. Invalidity must be shown by clear and convincing evidence, and the burden of proof falls on the challenger. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986). "[P]roof of indefiniteness must meet 'an exacting standard.'" *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010) (quoting *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008)).

### 1. Lelo Has not Shown that the Claim Term "generally tear-drop shaped" is Indefinite

The ALJ indicated that the meaning of "generally tear-drop shaped" is clear on its face and the specification provides sufficient explanation for the meaning of generally tear-drop shaped arms. A88. In addition to figures in the '605 patent, there is discussion of the shape of the arms of the device in the specification. *See* '605 Patent 2:25, 3:12. The Commission affirmed the ALJ. A88; A198.

Lelo argues that the term is indefinite because it is unclear how tear-drop shaped the arm must be to be "generally" tear-drop shaped. Lelo Br. at 55. Lelo's argument is misplaced under this Court's precedent as words of approximation such as "generally" do not serve to invalidate claims. "This court has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim." *Deere & Co. v. Bush Hog, LLC,* 703 F.3d 1349, 1359 (Fed. Cir. 2012). *See also Ecolab, Inc. v. Envirochem*, Inc., 264 F.3d 1358, 1367 (Fed. Cir. 2001); *Andrew Corp. v. Gabriel Elecs*. Inc., 847 F.2d 819, 821 (Fed.Cir.1988) ("The criticized words ['approach each other,' 'close to,' 'substantially equal,' and 'closely approximate'] are ubiquitous in patent claims. Such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have

been accepted in patent examination and upheld by the courts."). Thus, mathematical precision is not required in order to be definite. *Invitrogen Corp.v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005).

Moreover, Lelo's reliance on a case in which this Court found the term "aesthetically pleasing" indefinite is unavailing. *Datamize,* 417 F.3d at 1350-51. Rather than utilizing a subjective standard like "aesthetically pleasing" in this case, the patentee described the device's arms in detail and even provided figures depicting the arms. No more was needed.

Lelo criticizes a proposed circular definition for the claim term, Lelo Br. at 56, but overlooks the fact that the ALJ did not adopt any of the proposed constructions and indicated that the claim term has a plain and ordinary meaning. A68.

Lelo also contends the accused devices appear different, including devices which are no longer part of this investigation, and argues this would render the claim term indefinite. Lelo Br. 58-60. However the Commission properly found that both the Tiani and Tiani 2 infringe. The other devices were not part of the investigation at the time of the final determination because parties were terminated

from the investigation due to settlements. The Commission thus addressed all of the infringement issues that were presented.[10]

In short, none of Lelo's arguments demonstrate that it established by clear and convincing evidence that "generally tear-drop shaped" is indefinite.

### 2. Lelo did not Demonstrate that the Preamble "dimensioned to be worn by a female during intercourse" is Indefinite

The ALJ concluded that the evidence did not show that the preamble phrase "dimensioned to be worn by a female during intercourse" is indefinite. While Lelo contended that this language does not specify where on the female body the sexual stimulation device should be worn, the ALJ disagreed. The ALJ found the specification provided sufficient guidance to one skilled in the art regarding the term "intercourse," so the preamble language was not indefinite. A89. The Commission adopted the ALJ's finding that the preamble language is not indefinite. A187. The Commission noted the patent's teaching concerning the size

---

[10] Further, the test for indefiniteness requires a patentee to stake out the bounds of his or her invention; that is a separate question from whether an accused product infringes. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340–41 (Fed. Cir. 2005) ("The test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention.").

of the device in construing the preamble's "dimensioned" limitation.  A190 n.1

(citing the '605 Patent, 7:21-29, 58-60; 8:4-8, 10).

In this case, the specification of the '605 patent describes how the device is

to be used during sexual intercourse between a man and a woman and provides a

range of dimensions for the device that indicate how the device can be

dimensioned.  The '605 patent describes how the device is dimensioned to be worn

by a female.  '605 Patent 3:11-23.  The patentee also explains why the device will

not interfere with intercourse when worn.  '605 Patent, 3:27-31 ("It will also be

noted that because the inner arm 1 is drawn forward in use and the U-shaped

admittance arm or transition portion is quite thin and narrow, the device is sized

and shaped so that emplacement of the device will not interfere with ordinary

sexual intercourse.").

Lelo points to expert testimony that penises and vaginas vary in size, and

argues that there is no known standard for sizing a sexual stimulation device to a

female and male during intercourse.  According to Lelo, this variation renders the

preamble language indefinite.  Lelo Br. at 61-63.

Lelo is mistaken because the testimony indicated the relevant variations in

size are not large.  *See* A2254*;* Tr. 297:4-13 ("95 percent of women fall, again,

within 0.7 inches of one another…The erect male penis only varies in diameter 0.8

inches for 95 percent of men.").

Moreover, the specification provides specific guidance with respect to the size of the arms. The specification teaches that the arms range up to 1" wide and about 0.2" thick, and there are several figures along with other guidance as to the dimensioning of the parts of the device. '605 Patent, 8:4-8. *See also* '605 Patent, 7:21-29, 7:58-60, 8:4-8, 10:4-6. Thus, the specification makes it clear what the patentee meant by the preamble language.

Reliance on the specification is appropriate to clarify the meaning of claim terms. *See Exxon Research*, 265 F.3d at 1378-79 ("By looking to the specification, one of skill in the art could determine that a 'period sufficient' is about 0.25 hours, and preferably 0.5 hours."). *See also Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1372 (Fed. Cir. 2008).

Lelo's argument based on *Ex parte Brummer,* 12 USPQ2d 1653 (Bd. Pat. App. & Inter. 1989) is also inapposite. In *Brummer*, there was no way to ascertain the size of the bicycle that would satisfy the claim because it referenced a rider of unspecified size. However, as discussed, the specification of the '605 patent provides that the arms of the device are up to 1" wide and about 0.2" thick, and the written description of the '605 patent provides several figures along with other guidance as to the dimensioning of the parts of the device. The record also established that the range of dimensions of the overwhelming majority of penises

and vaginas are well-known and fall within a reasonably narrow range. *See, e.g.,*
A2254 (Tr. 297:4-13).

Further, contrary to Lelo's argument, there do not have to be known
standards for dimensioning of sexual stimulation devices for the claim to be
definite. *See Hybritech,* 802 F.2d at 1385 (notwithstanding the fact that those
calculations are not precise, or "standard," the claims, read in light of the
specification, reasonably apprise those skilled in the art and are as precise as the
subject matter permits).

In *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1575
(Fed. Cir. 1986), the Court held that a claim limitation specifying that a certain part
of a pediatric wheelchair be "so dimensioned as to be insertable through the space
between the doorframe of an automobile and one of the seats" was not indefinite.
The Federal Circuit explained that the fact that "a particular chair on which the
claims read may fit within some automobiles and not others is of no moment. The
phrase 'so dimensioned' is as accurate as the subject matter permits, automobiles
being of various sizes." *Orthokinetics*, 806 F.2d at 1576. In this case, the patentee
described his device as accurately as the subject matter permits, providing figures,

detailed descriptive language, and ranges of sizes for the arms in the specification.[11]

In sum, none of Lelo's arguments demonstrate that it established by clear and convincing evidence that the preamble is indefinite.

## VI.    CONCLUSION

For the reasons stated above, this Court should affirm the Commission's final determination.

Respectfully submitted,

/s/ Michael K. Haldenstein
Michael K. Haldenstein
*Attorney for Appellee*
James Worth
*Acting Assistant General Counsel*
Dominic Bianchi
*General Counsel*
Office of the General Counsel
U.S. International Trade
Commission 500 E Street, S.W.
Washington, D.C. 20436 Telephone
(202) 205-3041 Facsimile (202)
205-3111

---

[11] Lelo also lists nine "additional limitations" that it maintains Standard Innovation has argued are required by the preamble. Lelo Br. at 62-63. Standard Innovation has never argued that any of these limitations are required by the claims as issued, and Lelo cannot now argue for these additional limitations when it did not do so below.

# CERTIFICATE OF SERVICE

I, Michael K. Haldenstein, hereby certify on this 14th day of May

2014 that true and correct copies of the attached **CORRECTED**

**NONCONFIDENTIAL BRIEF OF APPELLEE INTERNATIONAL TRADE**

**COMMISSION** were served upon the following using the Court's CM/ECF

system, which will send notification to the following:

**On behalf of Lelo Inc. and Leloi AB:**

Hector J. Ribera, Esq.
**Fenwick & West, LLP**
801 California Street
Silicon Valley Center
Mountain View, CA 94041
hribera@fenwick.com

**On behalf of Standard Innovation (US) Corp. and Standard Innovation Corporation:**

Robert P. Lord, Esq.
**Osha Liang LLP**
Two Houston Center
909 Fannin Street
Houston, TX 77010
lord@oshaliang.com

/s/ Michael K. Haldenstein
Michael K. Haldenstein
Attorney for Appellee
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
tel. (202) 205-3041
fax (202) 205-2301
michael.haldenstein@usitc.gov

67

## CERTIFICATE OF COMPLIANCE

## PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(B), I hereby certify that the attached brief contains 13,928 words, according to the word-count function of the word-processing system used to prepare the brief (Microsoft Word 2010).


/s/ Michael K. Haldenstein
Michael K. Haldenstein


Dated:  May 14, 2014